*Formatted for Electronic Distribution*                              *Not for Publication*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

_____

In re:

    **MEGAN MAPLE a/k/a**                          **Chapter 13 Case**
    **MEGAN MELCHER-MILLER,**                        **# 07-10820**
    **Debtor.**

_____

Appearances:    *David W. Lynch, Esq.*          *Gail E. Westgate, Esq.*
                 *Colchester, Vt.*           *Primmer Piper Eggleston & Cramer*
                 *For the Debtor*            *Burlington, Vt.*
                                             *For the Creditor*

## MEMORANDUM OF DECISION
### ON DEBTOR'S MOTION TO VALUE COLLATERAL

      The issues presented in this disputed matter are: (1) what is the value of a mobile home which is the collateral for the primary secured debt in this case, and (2) is the Debtor's leasehold interest part of the collateral and, if so, how is it to be valued?

## I. THE FACTS & PROCEDURAL HISTORY

### A.    Background Facts

      Megan Maple (the "Debtor") filed her chapter 13 petition on December 6, 2007 (doc. # 1). In Schedule B to her petition, the Debtor valued her mobile home at $40,000. Id. In her chapter 13 Plan, the Debtor proposed to pay the Trustee $595 per month for 60 months, totaling $35,700, plus additional payments totaling $14,000 "from any of the following: collection of passed [sic] due child support or from additional direct payments available from tax refunds and in the event there is a projected balance due at the end of 59 months of payments, buy [sic] financing the balance of the Plan payments" for a grand total of $49,700 in Plan payments (doc. # 2). Contained within the Plan was a motion to value collateral, the mobile home, at $40,000. Id.

      In January 2008, Opportunities Credit Union (the "Creditor") objected to both the Debtor's Plan and the motion to value collateral (doc. # 10). The Creditor's objection detailed three Promissory Notes the Debtor had executed and delivered to the Creditor. Two of those Notes are relevant to this proceeding: "Note A," in the original amount of $5,000 (with an outstanding balance of $3,276.14), dated April 29, 2004, and "Note C," in the original amount of $39,139.92, dated July 2, 2004.[1] Id.

_____

[1] The filing did not indicate what the outstanding balance was on Note C.

As security for Note A, the Debtor executed and delivered to the Creditor a mortgage dated April 29, 2004. This mortgage described the property securing it as: "A 2004 Redmond Southwood A203 Serial # 12241856 located at 84 Meadow Lane, Lot 124 Riverview Commons Richmond VT 05477" (doc. # 24, Ex. F). This mortgage was recorded on May 7, 2004 in Book 154 at Page 694 of the Town of Richmond Land Records (doc. # 10 ¶ 5). As security for Note C, the Debtor executed and delivered to the Creditor a mortgage dated July 2, 2004. This mortgage described the property securing it as "All Borrower(s)' interest in the property and to certain rights as to a lot in a mobile home park described as: 84 Meadow Lane, Riverwatch Commons, Richmond, Vermont 05477, 2004 Redmond Southwood A203 Serial 12241856." (doc. # 24, Ex. C). This mortgage was recorded on June 27, 2005 in Book 164 at Page 356 of the Town of Richmond Land Records (doc. # 10, ¶ 6). The Debtor also executed and delivered Security Agreements dated April 29, 2004 and July 2, 2004 to the Creditor; the Creditors' security interests were perfected by the filing of UCC-1 financing statements with the Vermont Secretary of State and in the Town of Richmond Land Records. Id. ¶ 7.

There is no dispute that the Debtor breached the conditions of the mortgages and security agreements by failing to make the agreed-upon payments. The Creditor initiated a foreclosure action in Chittenden Superior Court in January 2007 entitled Opportunities Credit Union, f/k/a Vermont Development Credit Union v. Megan Melcher-Miller ak/k/a Megan Maple and All Occupants Residing at 84 Meadow Lane, Lot 124, Riverview Commons, Richmond, Vermont, Docket No. S0051-2007 CnC. The state court granted the Creditor summary judgment in August 2007 and a Judgment and Decree of Foreclosure (the "Judgment") was entered on September 6, 2007 (doc. # 10 ¶¶ 9, 10). The Judgment provided that the Debtor owed the Creditor $42,416.06 as the aggregate principal balance of Notes A and C, plus taxes, insurance, interest, filing fees, late charges, costs, and attorney's fees, resulting in a total judgment amount of $57,848.51 as of August 24, 2007, plus per diem interest from that date to the date of redemption. Id. ¶ 11.

In its Objection to the Plan, the Creditor asserted that the Plan did not propose to make any payments on the Creditor's notes, *per se*; the Plan did not specify how the Creditor would be paid its claims and in fact reduced the Creditor's secured claim from in excess of $57,848.51 to $40,000, and made no provision for interest; and was vague concerning how the Debtor would raise the $14,000 balloon payment. Id. at ¶¶ 18, 19. The Creditor also objected to the $40,000 valuation of its collateral, set forth in Schedule B, noting that the Town of Richmond reported the assessed value to be $51.300. Id. at ¶ 20.

The Creditor eventually secured an appraisal of the collateral, and on March 13, 2008 the Court held a two-hour evidentiary hearing to determine the value of the Creditor's collateral.

**B.**     **Hearing Testimony**

The Creditor's witness, Lawrence Rutherford, a licensed appraiser in Vermont, qualified as an expert real estate appraiser. He testified that he had conducted a visual exterior and interior inspection of the mobile home. Using the sales comparison[2] method of valuation, he estimated the home's value at $62,000; using a cost approach[3] method of valuation, he estimated the home's value at $59,400 (doc. # 23, Hearing Trans. p. 9-10). Both of these estimates were "sited improvements," i.e., considering the home on site in the mobile home park. In discussing the sales comparison approach, Mr. Rutherford stated that the Debtor's mobile home was a "double wide" home; however, his report showing comparables included a majority of "single-wide" homes because "double-wide" comparisons were "minimal." Id. p. 12. The two double-wides in his report included a pending sale and a current listing in the same trailer park, id., but no completed sales of double-wide mobile homes. He explained that he did not adjust the values between the single-wide and double-wide comparables because although the market preference appeared to be for double-wides, the single-wides offered "the same utility just in a different layout format" and therefore the adjustments he made in his report with respect to the single-wide and double-wide comparables were based on square footage and amenities rather than the width of the home. Id. p. 13. To compute value using the cost approach, Mr. Rutherford relied upon an accepted guide book that based the valuation figure on the square footage of the property and the quality of the home. Id. p. 14.

Although the home was built in 2003, Mr. Rutherford stated that the manufacturer considered it a 2004 model and therefore he valued it as a 2004 home. He assessed its overall quality construction at "average plus" and its maintenance level at average, although he noted in his report several items of "deferred maintenance." Id. pp. 14-16. He also stated that he had noted the separation of ceiling tile in the

---

[2]  The comparable sales approach has been described as follows:

> Under [the comparable sales approach] the appraiser researches the debtor's market place to find several recent sales of similar properties. Since very piece of property is unique, the appraiser then adjusts the actual sales prices of the comparables to account for both positive and negative differences between the comparables and the subject property. This process generates a range of adjusted sales and prices, within which the appraiser places the debtor's property in an attempt to ascertain what the debtor's property would actually sell for in its own market.

In re SM 104 Ltd., 160 B.R. 202, 212 (Bankr. S.D. Fla. 1993) (citing C.F. Sirmans, Real Estate Finance at 132-37 (2d ed 1989).

[3] The cost approach has been described as follows:

> The Cost Approach, utilized by the City's Appraiser, determines Market Value from the sum of the depreciated value of what it would cost to reproduce the improvements plus the estimated value of the land based on comparative sales data. The accuracy of this method is contingent on the availability of reliable comparable data to determine the value of the land and the validity of the assumption that in the eyes of a buyer, the value of the improvements is equal to their cost.

In re River Valley Fitness One Ltd. P'ship,  2006 WL 618442 at * 3 (Bankr. D.N.H. 2006)

kitchen, missing trim, torn screens and "a few other things" that he considered to be "cosmetic in nature," but he had not included any adjustment for the "cost to cure." Id. pp. 16-17.

During cross-examination, Mr. Rutherford commented that mobile home appraisals are done in two circumstances: either sited or proposed to be sited. Id. p. 19. He admitted that mobile homes depreciate in value after the date they are purchased based on the effective age and how they are maintained, "although costs have increased and appreciated" in building manufactured homes. Id. p. 20. Questioned about how he arrived at the cost approach figure, Mr. Rutherford answered that typically an appraiser multiplies the cost factor (of $38.50 in this case) by the "gross living area." Id. p. 21. He stated that although he had listed 1,404 square feet as the "gross living area" in his report, he multiplied $38.50 by 1,568 square feet, because that was the figure the manufacturer used to describe the 28 x 54 foot "improvement" (which included the outside of the home and a four-foot hitch). He also used the larger exterior square foot measurement for all the comparables in order to be consistent. Id. pp. 21-22. Pressed by Debtor's counsel, Mr. Rutherford calculated the cost approach valuation using the 1,404 square feet measurement and agreed with the $54,054 resulting amount (which was over $5,000 lower than the $59,400 figure he quoted by using 1,568 square foot exterior measurement in his appraisal report). Id. pp. 23-24.

Debtor's counsel then questioned Mr. Rutherford on how depreciation of the home would impact his appraisal. He responded that he uses "three percent per year of effective age" or 9% for this home with an effective age of three years – even though the home had an actual age of four years. Mr. Rutherford explained that the difference between the three year effective age and the four year actual age was a "subjective" adjustment based on how the appraisers in his firm viewed the condition of the property. Id. pp. 24-25.

Next, counsel queried Mr. Rutherford on the six comparables and the adjustments he had made to the prices of those units to arrive at an "adjusted sales price comparable." Mr. Rutherford stated that one comparable might be given more weight than another comparable when figuring out the valuation of the subject property, based upon similarities of age, condition, and location. Id. p. 30. However, here, in the final reconciliation of the six comparables, he stated that "no one comparable was the most dominating indicator" Id.

Debtor's counsel questioned Mr. Rutherford as to how all of the comparables in his report, even given their depreciation, increased in value after his adjustments. For example, comparable # 1, which sold for $39,900, and was depreciated $8,400, had an adjusted sales price of $60,200. Mr. Rutherford explained that he compared gross living areas to make his adjustments, although he in fact used the manufacturer's square footage figure which increased the upward adjustment of value of all comparables. Id. pp. 33-35. Counsel then attempted to elicit a value for the home if it was not sited on a lot. Id. p. 42. Mr. Rutherford stated it was "somewhat of a subjective or extracted value," but "[b]ased on the informa-

tion I was able to retrieve from past appraisals and speaking with mobile home professionals, [mobile home value] increases as time goes on based on age of the improvement, the percentage or ratio does." Id. He then stated "For a home such as the subject, I would estimate it somewhere between $8,000 and $12,000,"[4] although it was unclear if he was referring to the amount of depreciation. Id. Despite attempts from both Creditor's attorney, the Court, and Debtor's counsel, id. pp. 49-56, Mr. Rutherford never clarified what he meant. It seems most likely he was suggesting that an unsited mobile home would be worth $8,000 or $12,000 less than the adjusted sales price or the actual sales price.

Randy Lebeau, a salesman for Latham Homes for twenty-one years, testified on behalf of the Debtor. He stated that he had sold approximately 1,500 to 2,000 mobile homes, including the home he sold to the Debtor, and that he had bought between 50 and 100 homes over the course of his career. Id. pp. 58-59. As a result, he believed he had the expertise to value mobile homes. Id. p. 59. The Debtor's attorney moved to qualify him as an expert on valuation, and the Creditor's attorney objected, arguing that the Debtor had offered no credentials or documentation to support the motion Id.. Through further questioning, Mr. Lebeau attested that during his career, he had had "ample experience on how the appraisal process works, valuing homes, sited construction cost, procedures, fairly expensive banking as far as financing" and that although he wasn't certified, he was involved in these tasks on a daily basis. Id. p. 60. He stated that in Vermont, he did not need certification to value mobile homes for purposes of his business, nor did the State require him to be a licensed real estate appraiser to appraise the value of mobile homes Id. The Debtor's attorney again sought to qualify Mr. Lebeau as an expert, and the Creditor's counsel again objected. Id. pp. 60-62. The Court ruled that the testimony could go forward, but the weight given it would depend on post-hearing submissions that addressed whether a person not certified by the State could qualify as an expert for purposes of valuing a mobile home. Id. pp. 62-63.

Mr. Lebeau asserted that he had inspected the Debtor's mobile home on the day prior to the hearing, and assessed it to be in average or low average condition for its age. As the basis for that assessment, he pointed to the kitchen ceiling area that required repair since tiles had come loose; several areas of molding that were missing, damaged, or needed to be replaced; interior doors that needed to be repaired, replaced, and adjusted; carpeting that was severely worn; and stains on the outside of the home. Id. pp. 63-64. Asked what it might cost to bring the home up to saleable condition, Mr. Lebeau asserted that the carpeting would be the most expensive item to replace and that, along with some finished carpentry work

---

[4] The exchange concerning unsited value of the mobile home deserves repetition, as it is so unclear and unhelpful.

Q:     Can you give me a statement of the value of the asset, the mobile home, if it's not located on the lot? If it's, say, a
       sales lot at Latham Homes, for instance?

A:     It's somewhat of a subjective or extracted value, no specific formula I was able to determine based on an unsited
       home. Most of our homes are sited. Based on the information I was able to retrieve from past appraisals and speaking
       with mobile home professionals, it increases as times goes on based on age of the improvement, the percentage or ra-
       tio does. For a home such as the subject I would estimate it somewhere between eight to $12,000. But again it's –
       there is no specific formula for determining that because it has no utility sitting on the lot or on the park.

(doc. # 23, p. 42)

that would be required, it would cost $4000 to $5000. Id. pp. 65-66. He also stated that homes similar to the one owned by the Debtor were selling for between $65,000 and $70,000 new, delivered to a site (not including the siting work). Id. p. 67. Given its age and condition, he valued the Debtor's mobile home at $50,000 on site and $35,000 off site. Id. p. 68. Counsel specifically asked Mr. Lebeau why his estimate was so much lower than Mr. Rutherford's. Mr. Lebeau identified the condition of the home and the local market for mobile homes to be the primary factors underlying this valuation differential. He stated that there were many homes on the market and many mobile homes were being foreclosed upon, at this time, and he had noticed a corresponding depression in the value of mobile home prices within the last 12 to 18 months. Id. pp. 68-70.

The last witness to testify as to the value of this mobile home collateral was the Debtor. She recounted that she had purchased the mobile home from Mr. Lebeau for a price $51,300,[5] and that price included delivery to the site, steps, skirting, and $1,315 of new furniture. Id. pp. 80-83. Additionally, she had made certain improvements at the site: she installed a $5,000 slab and a $3,000 fence. Id. pp. 84-85. She stated she had been a mortgage processor for ten years. She said she had gone on-line to consult the NADA guide book in order to value her property. Over Creditor's counsel's objection, the Debtor stated that she typed in the pertinent descriptive information about the home and arrived at which she believed was "$32,000 or $34,000." Id. pp. 85-86. She did not specify whether this valuation of the mobile home was on site or off site. She also testified that prior to filing her bankruptcy case she telephoned Mr. Lebeau to ask him what price he expected he could obtain for the home if he were to sell it on site; he gave her a figure of $40,000 and that was the valuation she assigned to the mobile home in her Schedule B. Id. pp. 86-87. She stated that the highest and best price she thought she could receive for the mobile home would be between $40,000 and $45,000, on site, and that she would not know how to value the home off site. Id. pp. 87-88. The Debtor mentioned that in addition to the damage noted by Mr. Lebeau, there was a hole in the wall in one of the children's bedrooms and that she needed screens in three windows. Id. pp. 90-91, 93. She confirmed that the figure given by Mr. Lebeau for repairs, $4000 - $5,000, corresponded to the average price she had obtained when she had solicited repair estimates over the years. Id. pp. 91-92.

## C.      Post-Hearing Submissions

Following the hearing, the Creditor submitted a memorandum of law, arguing: (1) the loan documents upon which the judgment of foreclosure was based reflected a perfected security interest in both the Debtor's mobile home and the associated leasehold interest; and (2) the fair market value of the sited home was $62,000 (doc. # 24). The Debtor submitted a memorandum in response, asserting: (1) the foreclosure judgment described a mobile home, not a leasehold interest; (2) the security instruments did not convey an interest in the leasehold; (3) the leasehold was not assignable in any event; (4) Mr. Lebeau

---

[5]  The Purchase Order shows the sale price to be $51,315. (Debtor's Hrg. Ex. 1)

was qualified to give an opinion as to the value of the mobile home; and (5) the mobile home was worth $40,000 (doc. # 27). The Creditor responded to Debtor's memorandum (doc. # 31) reiterating its objection to Mr. Lebeau's testimony and disagreeing generally with the Debtor's various positions, and the Debtor filed a reply memorandum (doc. # 34) in response to that filing.

## II. DISCUSSION

In order for a chapter 13 Plan to be confirmed, the Debtor must meet a number of requirements, including that she "will be able to make all payments under the Plan and . . . comply with the Plan." 11 U.S.C. § 1325(a)(6).

The Creditor argues that it holds a secured claim of $57,848.41, the amount of the state court foreclosure judgment, rather than a secured claim of $40,000 as the Debtor asserts, based upon her Schedule B valuation of her home. The Creditor contends that the valuation of the home is $62,000 (representing the higher of the two valuations proffered by its expert, and exceeding the amount due under the judgment). The Debtor continues to value the home at $40,000 – which appears to be an on site valuation.[6] Nevertheless, in order to arrive at a valuation figure, the Court must first answer some questions of law that remain after the hearing. The first question concerns how to assess Mr. Lebeau's testimony: does he qualify as an expert on valuation or not.  The second question concerns the scope of the Creditor's collateral: does it include the site or not?

### A.    Does Mr. Lebeau Qualify as an Expert?

Federal Rule of Evidence 702, Testimony by Experts, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

F.R.E. 702. The well known case of <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) interpreted this rule to require courts to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." <u>Id.</u> at 589. The subject of an expert's testimony must be scientific knowledge. "The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." <u>Id</u> at 589-90. Trial judges are directed to assess the scientific validity of an expert's method before permitting the expert to testify at trial. <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999) clarified that the court's "gatekeeper" obligation extended not only to a review of a witness's scientific expertise, but to the

---

[6] During her testimony, the Debtor stated that Mr. Lebeau estimated – sight unseen – that her home was worth $40,000 on site, which was the figure she inserted in her Schedule B. At the hearing, the Debtor testified that the best price she thought she might be able to garner for the home was between $40,000 and $45,000 on site.

expertise of all witnesses seeking to qualify as experts, whether scientific, skill, or experience based. Id. at 148-49.  The Court applies that guidance here.

Mr. Lebeau does not have the requisite training and qualifications (including an appraiser's license) to qualify him as an expert appraiser for purposes of providing valuation testimony. However, that is not the end of the inquiry because his uncontradicted testimony revealed that he did not need a State certification to value mobile homes for purposes of his business, nor did the State require him to be a licensed real estate appraiser to appraise the value of mobile homes (doc. # 23, p. 60). Other courts have held, for example, that real estate brokers who were not licensed appraisers, were nevertheless qualified to provide expert opinions on valuation notwithstanding a lack of formal appraisal training. See, e.g., Neuger v. Casgar (In re Randall Constr. Inc.), 20 B.R. 179, 185 (N.D. Ohio 1981) ("[Witness's] credentials as a realtor with 21 years experience in appraising properties seem more than adequate to qualify her as an expert with respect to the property in question."). The Federal Rules of Evidence are governed by a liberal admissibility standard, which applies to the rule governing expert witnesses in particular. See U.S. v. Dukagjini, 326 F.3d 45, 52 (2d Cir. 2003) ("The Rules of Evidence provide a liberal standard for the admissibility of expert testimony"). Accordingly, the Court finds that Mr. Lebeau's experience in selling mobile homes – in particular, those built by the same company that manufactured the Debtor's home – to the extent that it informs his "specialized knowledge" about sales of mobile homes, qualifies him to opine on the most reasonable sale price for the Debtor's mobile home. While accepting Mr. Lebeau as an expert, the Court will give limited weight to his testimony, specifically because of his lack of formal credentials and training.

## B.      What Is the Value of the Creditor's Collateral?

The Court has before it conflicting testimony, both in terms of methodology and outcome, with respect to the value of the Debtor's mobile home. In In re Smith, 267 B.R. 568 (Bankr. S.D. Ohio 2001), the court provided a helpful context in which to weigh conflicting appraisal testimony. It concluded that a court should

> generally evaluate a number of factors, including . . . the appraiser's education, training, experience, familiarity with the subject of the appraisal, manner of conducting the appraisal, testimony on direct examination, testimony on cross-examination, and overall ability to substantiate the basis for the valuation presented. A bankruptcy court is not bound to accept the values contained in the parties' appraisals; rather, it may form its own opinion of value of the subject property after considering the appraisals and expert testimony.

Id. at 572 (citation and quotation marks omitted). For example, in Buckland v. Household Realty Corp. (In re Buckland), 123 B.R. 573, 578-79 (Bankr. S.D. Ohio 1991), the court rejected both the debtor's and the creditor's valuations, noting that "[a]lthough the court finds the testimony of the debtors' appraiser and the debtor to be persuasive, it does not find this testimony to be fully conclusive on the issue of valuation." Further, "[a]n owner is competent to give [her] opinion of value, with knowledge of its

condition and its purchase price." Hirsch v. IRS (In re Hirsch), 351 B.R. 291, 297 (Bankr. E.D.N.Y. 2006).

Against that backdrop, the Court gives the testimony of the Creditor's expert, Mr. Rutherford, minimal weight. The Court finds that his testimony suffers from a number of flaws, contains significant inconsistencies, and is generally unhelpful and unpersuasive. First, while Mr. Rutherford stated he arrived at two different valuation figures based upon the two different methods he utilized, he never stated why the higher figure arising from the sales comparison approach ($62,000) trumped the lower figure calculated from the cost approach ($59,400). Second, the Court rejects Mr. Rutherford's explanation that he used the 1,568 square foot manufacturers figure rather than the 1,404 square foot "gross living area" figure in order to be "consistent" in his cost approach. The appraisal form he employed specifically requires the "gross living area" figure, and use of the manufacturer's figure unquestionably inflated the value. In the absence of a sound explanation for this higher square foot figure, the Court finds it to constitute a flaw in the valuation methodology. Further, Mr. Rutherford testified that the value would be $54,054 if he were appraising a mobile home with 1,404 square feet of "gross living area." This is, of course, at odds with figure he provided in his report.

Third, the Court finds that it impossible to reconcile Mr. Rutherford's testimony that he assessed the home at "average plus" condition with the addendum on his own report that indicates the "physical depreciation of the home is considered to be slightly higher than typical for this age home." (Trial Ex. B Addendum). While his report provided a caveat that he was not qualified to assess the damage, he did not adjust his comparable sales analysis at all to take into account this damage or explain why he did not do so. This defect in his analysis is underscored by the testimony of both Mr. Lebeau and the Debtor who stated there was significant damage that would need to be repaired to bring the home into "saleable condition" and these repairs would cost between $4,000 and $5,000.

Fourth, while Mr. Rutherford acknowledged that mobile homes depreciate approximately 3% per year, he still found that the value of this mobile home – which initially sold for $51,315– now had a value of $62,000, without any explanation as to why this particular mobile home did not depreciate. Arguably, some of the increase may be attributed to his valuation of the property on site. However, when counsel and the Court attempted to clarify what Mr. Rutherford meant when he responded to the question of what the value of the home would be if it was not sited on the lot by stating "somewhere between $8,000 and $12,000," those attempts at clarification came to naught. This highlighted a general problem with his testimony: his answers were frequently nonresponsive, inscrutable, or unclear. This lack of clarity diminished the persuasiveness, value, and credibility of his testimony.

Finally, the Court questions Mr. Rutherford's conclusion that, under the comparable sales method, the Debtor's mobile home has a value of $62,000. The two highest priced, and most similar, comparables (the only two double-wides in the report) were a listing and a pending sale. The appraiser properly chose

not to include the sales listing at all in calculating the value of the Debtor's home, and properly gave less weight to the pending sale (which he did not know the final sales price) (doc. # 23, pp. 30-31). The Court finds that these comparables used were not impressively comparable.[7] Additionally, he did not explain clearly how, for example, comparable # 2, which sold for $39,900, was listed in inferior condition, had an actual age of 13 years and an estimated age of 7 years, still could be valued at an adjusted sale price of $60,200, taking into account depreciation. The numbers simply did not add up.

The one aspect of Mr. Rutherford's testimony which was undisputed and convincing – and thus, the Court adopts – is his expert opinion that mobile homes depreciate 3% per year. Deducting nine percent of the original sale price ($51,315) amounts to a deduction of $4,618 and results in a depreciated value of $46,697. This value is quite close to the values proffered by both the Debtor and Mr. Lebeau (the Debtor testified that she believed the high end of what she could sell the mobile home for on site was $45,000, and Mr. Lebeau estimated a gross sale price, on site, of $50,000) subject to adjustment for repairs. The Court therefore deems $46,697 to be the appropriate starting point for valuing the mobile home.

The Court turns next to the question of what adjustments, if any, should be made to this figure. In this regard, the Court finds the testimony of both Mr. Lebeau and the Debtor to be helpful. They specified similar repairs, costing between $4,000 and $5,000, that needed to be made to bring the home to saleable condition. These repairs, incidentally, were not all that dissimilar from the "physical deficiencies" set out in the addendum to Mr. Rutherford's report. The Court finds this testimony to be credible and persuasive. However, since neither party itemized precisely how much each repair would cost, the Court adopts the lower end of the range.  Therefore, the Court reduces the initial valuation figure of $46,697 by $4,000. This leads the Court to conclude that the actual fair market value of the property, on site, is $42,697. The Court adopts that figure as the fair market value of the Debtor's mobile home, on site, after considering the substance and weight of the conflicting testimony presented by the three witnesses.

The Debtor has argued that the mobile home value should be further reduced to reflect what it would sell for, off site. Interestingly, the Debtor and Creditor both argue that the language of the state court foreclosure judgment determines whether the Creditor's collateral includes the Debtor's leasehold interest.[8]  In the final analysis, however, the Court concludes that it need not address this question since

---

[7] Mr. Rutherford explained this approach only after being closely questioned by Debtor's counsel. When asked about comparable # 6, he noted that it was a listing, which "might not weigh as heavily as a closed sale." Pressed further, he acknowledged that he did not use comparable 6 at all. While not going as far as characterizing his first answer as evasive, the Court finds that such answers lead it to give his testimony less weight.

[8] The judgment took the description of the foreclosed property verbatim from the April 2004 mortgage and described the "Mortgaged Property" as "A 2004 Redmond Southwood A203 Serial # 12241856 located at 84 Meadow Lane, Lot 124 Riverview Commons Richmond VT 05477." However, the judgment referred to both the April 2004 and July 2004 mortgages and the related financing statements. The July 2004 mortgage described the Mortgaged Property as "All Borrower(s)' interest in the property and to certain rights as to a lot in a mobile home park described as: 84 Meadow Lane, Riverwatch Commons, Richmond, Vermont 05477, 2004 Redmond Southwood A203 Serial  12241856" (emphasis added). Based on the language of

the testimony presented only provides the Court with a basis for valuing the collateral on site. Only Mr. Lebeau testified to valuing the mobile home off-site, and that $35,000 figure was not substantiated. He did not explain how he arrived at that number: was it based on his experience selling comparable mobile homes off site or was it mere speculation? Without substantiation the Court cannot give that testimony any weight. Neither of the other two witnesses were prepared to offer any support or basis for valuing the mobile home off site. Mr. Rutherford's testimony and methodology were deliberately limited to the valuation of the mobile home on site and his responses to questions with respect to the mobile home's value off site was muddled. The Debtor stated that the $40,000 valuation figure that she inserted on her Schedule B was an on-site valuation and that was the figure the Debtor adhered to in her post-hearing filings. In sum, since the hearing has been concluded and the only competent testimony presented values based upon the mobile home being on site, the language of the Judgment is irrelevant to the valuation of the Creditor's collateral. Even if the Court were to find that the Judgment limited the Creditor's security interest to the mobile home, off site, the Court would have no evidence upon which to reach a different conclusion than the valuation set forth above.

### III. CONCLUSION

Based upon the record in this case, including the documents and testimony presented at the evidentiary hearing, and for the foregoing reasons, the Court determines the value of the Creditor's collateral to be $42,697.

This constitutes the Court's findings of fact and conclusions of law.

Rutland, Vermont
August 8, 2008

_____
Colleen A. Brown
United States Bankruptcy Judge

---

the judgment, the Creditor claims that its secured claim includes home and the leasehold interest, because the judgment arises from the mortgage that includes the leasehold interest. The Debtor contends that the judgment's description of the mortgaged property controls and it does not include the leasehold interest. While the body of the judgment refers to both mortgages, the judgment specifically describes the mortgaged property as the mobile home only.